**LAURACK D. BRAY**
**P.O. Box 611432**
**Los Angeles, California 90061**
**Tel.: (805) 901-2693**

**Plaintiff Pro se**

2012 JUL -2 AM 11: 15

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY _____

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

**LAURACK D. BRAY**

       **Plaintiff,**

v.

**DEPARTMENT OF JUSTICE, et al.,**

       **Defendants.**

**CV12-5704** (RZ)

NO. _____

**PLAINTIFF'S APPLICATION FOR AN EX PARTE TEMPORARY RESTRAINING ORDER AND FOR AN ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION**

_____

Pursuant to F.R.C.P., Rule 65(b), Plaintiff moves the Court for a temporary restraining order (TRO) to restrain, enjoin, or otherwise order the following actions :

1. Restrain the Federal Defendants herein, to include or otherwise as individual defendant, Steven R. Sellers, trustee of the property located at 1019 E. Santa Clara Street, Ventura, CA, 93001, or whoever is in rightful ownership of said property , from selling, leasing, renting, or otherwise passing or

1

transferring possession of the said premises to anyone else besides Plaintiff until the merits of Plaintiff's Complaint is decided.

2.  Order the immediate, or as soon as reasonably possible, dispossession (or vacation) of the premises by anyone currently possessing, residing, or otherwise living in the premises .

3.  Require the federal defendants or Defendant Sellers, the trustee of said property, or the rightful owner of the property to allow, permit, or otherwise cause Plaintiff to immediately, or as soon as is reasonably possible, to take possession of the premises located at 1019 E. Santa Clara Street, Ventura, CA.

4.  Require the federal defendants, to include Defendant Sellers, or the trustee of the property, or whoever is the rightful owner of the property to continue to maintain the premises and expenses of the premises until a final decision is reached regarding the merits of Plaintiff's Complaint herein; and not require any payment of rent, lease, mortgage, or other payment from Plaintiff regarding possession of the premises until the merits of the case is finally resolved through a trial or otherwise.

5.  Require Defendants to show cause why this court should not issue a preliminary injunction extending such temporary relief pending an adjudication on the merits.

2

The grounds for the motion will be set forth below in the brief

memorandum of points and authorities in support of the motion.

WHEREFORE, Plaintiff moves the Court for a TRO and a Show Cause order

for a preliminary injunction.

Attached to this Motion is an affirmation from Plaintiff and several exhibits.

Also attached is a proposed TRO and Show Cause Order pursuant to Local Rule

7-19.   Rule 7-19.1 notice is also attached.


**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION**

I

**BRIEF   INTRODUCTION**

In 1999, Plaintiff entered into a month-to-month rental agreement with the

then owner/management of the premises located at 1019  E. Santa Clara Street,

Ventura, CA, 93001.  This agreement created a constitutionally protected

possessory  interest in the property  for Plaintiff.  See a copy of the agreement,

infra.  Further, management understood that the storefront premises would be

utilized as both a home and a law office for Plaintiff.   Plaintiff is a Black lawyer.

Because of the unique physical makeup of the unit and its location in the city,

Plaintiff became attached to the unit.   In 2003, Plaintiff brought  a negligence

3

action against the landlord/management for unreasonable electric bills (that

Plaintiff charged was in part management responsibility) and uninhabitable

premises.   Prior to the trial, Plaintiff sought and obtained a TRO and a

preliminary injunction prohibiting management from collecting rent until

further notice from the court.    See copies of the Orders, infra.    Plaintiff

ultimately obtained a judgment in his favor .   The landlord, in turn, and

Plaintiff believes in retaliation, brought an unlawful detainer proceeding

seeking plaintiff's eviction based on the premise of non-payment of rent,

although Plaintiff had never missed a rent payment, and the manager testified

to this during the negligence trial.  Nonetheless, the white  presiding judge,

Steven Hintz ( a Defendant in Plaintiff's herein Complaint and a different judge

from the negligence trial judge), allowed the trial to proceed .    Plaintiff

demanded and paid for a jury trial.  During the trial,  Hintz exhibited several

instances of misconduct, e.g., answering a jury question that was required to be

answered by the jury, which ultimately caused and resulted in Plaintiff's

eviction.   Hintz entered the eviction judgment.

    In 2007, Plaintiff filed a criminal-civil  rights complaint with the U.S.

Attorney's Office  against multiple individuals, including Hintz, charging racial

discrimination causing Plaintiff's eviction and other criminal acts during the

processing of Plaintiff's civil appeals of the eviction. Plaintiff intended to seek

and sought restitution, in the event of a prosecution and conviction, and part

of the restitution being sought was injunctive relief and re-possession of the

Ventura, CA premises that plaintiff was unlawfully evicted from. Plaintiff has

filed several criminal complaints with the U.S. Attorney's Office since the 2007

complaint , and with each complaint filed where Plaintiff has designated himself

a victim, he has sought or intends to seek restitution, and part of that

restitution sought was and is injunctive relief and an order to return possession

of the Ventura property to Plaintiff, where applicable.

Finally, in July, 2011, Plaintiff filed the latest two Complaints, with one

complaint specifically addressing the Ventura property, and specifically

informing the FBI and the U.S. Attorney's office that Plaintiff continues to seek

to re-possess the premises upon resolution of the criminal complaint and

prosecution and conviction that would lead to restitution and injunctive relief.

Plaintiff discovered that of May, 2011, the property was vacant while

undergoing renovations, so Plaintiff requested the FBI to seize the property

before it was possessed by anyone(for the protection of Plaintiff's rights), so

that it would be less complicated and prejudicial to anyone, with the

knowledge that Plaintiff is seeking re-possession of the premises upon

resolution of the criminal complaint, and restitution and injunctive relief.   The

federal Defendants, the FBI and the USAO, have not responded to Plaintiff's

latest two complaints filed, so Plaintiff does not know the status of the property

or the status of any possessory rights in the property.

II

**REASONS  FOR THE TRO AND SHOW CAUSE ORDER**

The main reason for the temporary restraining order is to assist Plaintiff in

re-gaining possession or re-possessing the premises located at 1019 E. Santa

Clara  Street, Ventura, CA (or protecting Plaintiff's rights).    Plaintiff was

dispossessed of the premises in 2003 through a wrongful eviction brought

about through the unconstitutional and racially-discriminatory actions of a state

trial judge.     At the time of the wrongful conviction, Plaintiff was utilizing the

premises as both his home and law office.   Therefore, the wrongful eviction

deprived Plaintiff of a home and a law office and practice.     Plaintiff has

consistently fought and sought to re-gain possession of the premises since 2003.

That fight has entailed both civil and criminal  processes or procedures and has

involved both the Executive and Judicial branches of government,  with a major

emphasis on misconduct.

The present Complaint is the culmination of obstacles encountered and a journey pursued towards the goal of re-gaining possession and possessory rights over property initially secured by a valid rental agreement.

The second reason for the TRO and Show Cause Order is to prevent the federal defendants, including the trustee of the property in question from selling, leasing, renting, or otherwise passing possession of the premises to another, or other than Plaintiff until the merits of Plaintiff's Complaint are finally decided, to prevent an additional obstacle to Plaintiff re-gaining possession of the premises.    Plaintiff knows that of May 31, 2011, the property was not occupied (and was undergoing construction or restoration).    Plaintiff, while filing a criminal Complaint with the U.S. Attorney's Office in July, 2011, requested the FBI seize the property until a final decision is made with respect to the criminal complaint.    However, neither the FBI nor the U.S. Attorney's Office has contacted me regarding my request.    However, I recently learned that there is a trustee over the property after visiting the County Assessor's Office in Ventura County on election day, June 5, 2012 (I still vote in Ventura County).

A third and final reason for the TRO is to require the federal government, especially the U.S. Attorney's Office and the FBI—to include the trustee of the

property, until further notice, to respond to Plaintiff (as otherwise required by

law) regarding the Ventura property and premises and/or Plaintiff's Complaint.

Again, the government did not respond to my request for seizure of the

property, so I do not know the state of the ownership of the property, other

than a trustee, according to the assessor's office.


### III

**PLAINTIFF SATISFIES ALL REQUIREMENTS FOR INJUNCTIVE RELIEF**

Plaintiff can demonstrate : (1) a likelihood of success on the merits; (2) a

likelihood of irreparable harm if preliminary injunctive relief is not granted; (3)

the balance of equities tips in his favor; (4) an injunction is in the public interest.

See <u>Winter v. Natural Res. Def. Council, Inc.</u>, 129 S. Ct. 365 , 374 (2008).

**A. PLAINTIFF BELIEVES HE IS LIKELY TO SUCCEED ON ALL CLAIMS, HOWEVER, FOR PURPOSES OF THE TRO AND SHOW CAUSE ORDER, PLAINTIFF SUGGESTS THE COURT LOOK TO TWO CLAIMS FIRST.**

Plaintiff has charged the federal defendants, in Counts II and III of the

Complaint , with constitutional fraud and a Fourth Amendment violation

involving the mail, respectively.

In Count II, Plaintiff charged the federal Defendants Department of Justice

(U.S. Attorney's Office, Los Angeles, CA), Andre Birotte, Thomas O'Brien, and

unnamed Assistant United States Attorneys (AUSAs) working in the Citizens Unit of the USAO with constitutional fraud for using and/or relying on false and fraudulent information and/or statements to avoid or evade their duty to investigate and/or prosecute Plaintiff's filed criminal complaints and to deny Plaintiff his statutory right to restitution.    This, in turn, was a violation of Plaintiff's constitutional due process rights (both procedural and substantive---based on the denied restitution, which would include injunctive relief mandating the transfer of possession and ownership of the Santa Clara premises to Plaintiff for use as his home and law office).

Since the fraudulent letters are the subject of the claim, and since the letters themselves acknowledge that criminal complaints were received by the USAO, there's no need to submit copies of the Complaints here (also because the contents of the Complaint is not at issue for the fraud claim), and none will be submitted .   However, two letters will be submitted as Exhibits #1 and #1A.    In Exhibit #1 (dated March 7, 2008), the government states "The United States Attorney's Office does not conduct criminal investigations".  This statement is clearly false or a "lie", because the USAO does conduct criminal  investigations.    In Exhibit #1A (dated January  28, 2011), the government states, "Please be advised that this agency <u>does  not</u>

conduct investigations. . . , therefore we consider this matter closed."

(Emphasis in original letter).   Here, this letter goes further than the first and

falsely states that the USAO  not only does not conduct criminal investigations,

but  that it does not conduct  "any"  investigations (criminal or civil).  The

USAO in fact and truth conducts both types of investigations.   And, the

statement is made and given as advice, therefore, its false advice to the

public.   Further, and finally, the USAO demonstrates that it relied on the

false statement to close the case without an investigation or prosecution.

This caused the false statement to be fraudulent.   And, because there was

no investigation or prosecution to determine the merits of Plaintiff's

Complaints, Plaintiff was denied procedural due process.   And, because

Plaintiff was  intentionally denied his right of restitution (which would have

included injunctive relief for the return of possession of his home-law office)

due to the government's   refusal and failure to investigate and prosecute,

Plaintiff was denied substantive due process.

As to "some" proof that the USAO's statements were false regarding

conducting investigations,  Plaintiff offers Exhibits #2 through  #7.  See also

the U.S. Attorney's Manuel, at 6-4.240  "United States Attorney's

Responsibilities", where  "The United States Attorney is normally responsible

for the investigation and prosecution of criminal tax matters that the Tax Division has authorized".

In Count III, Plaintiff charges a violation of his constitutional right against unreasonable searches and seizures pursuant to the Fourth Amendment of the U.S. Constitution.   On various dates,  when Plaintiff's client, Syed Jawaid , mailed Plaintiff letters at the Post  Office in  LaVerne/Pomona, California, the letters were sealed and placed into the mail box.  However, when Plaintiff received certain letters, the letters had been opened, at the sides of the letters.   Neither Plaintiff nor Mr. Jawaid gave the Post Office or any postal workers, or anyone else within the post offices at either the Pomona  location, where mailed, or the Los Angeles location (where Plaintiff has a post office box), where received, or any locations or stops between the two aforementioned locations permission or consent to open the mail sent by Mr. Jawaid to Plaintiff.   Therefore, the opening of the letters by the postal service workers, civilian or government,  at whatever level,  was unauthorized, not consented to, and unpermitted.   The Fourth Amendment states, in part, "The right of the people to be secure in their persons, houses, ***papers***, and effects, against unreasonable searches and seizures, shall not be violated. . . ."

(Emphasis added).   "It has long been held that first-class mail such as letters

and sealed packages subject to letter postage---as distinguished from

newspapers, magazines, pamphlets, and other printed matter---is free from

inspection by postal authorities,  except in the manner provided by the

Fourth Amendment."   United States  v. Van Leeuwen,  397 U.S. 249 (1970).

No  warrant was obtained to search plaintiff's mail, and in any event, there

was not probable cause to secure one.  "It has long been established that an

addressee has both a possessory and a privacy interest in a mailed package."

U.S. v. Hernandez,  313 F.3d 1206 (9th Cir. 2002).   Plaintiff submits a copy

of two of the letters (on one page) here as Exhibit #8.  Both letters were

stamped and/or endorsed by a postal employee indicating that the letter had

been received opened or "unsealed", after Plaintiff had asked her to observe

his mail before placing it in his mailbox at the post office.  See also

Affirmations  of Syed Jawaid and  Plaintiff as  Exhibits #9 and  #10 respectively.

Since these claims are inextricably a part of Plaintiff's racial

discrimination claims, they also buttress those claims in support of a

likelihood of prevailing on the merits.  And, finally, with respect to a

likelihood of success on the merits, Plaintiff  will submit a copy of the rental

agreement which provides Plaintiff with possessory and property rights to the

property located at 1019 E. Santa Clara Street, Ventura, CA, at Exhibit #11,

and copies of orders granting a temporary restraining order and a

preliminary injunction at Exhibits #12 and #13 respectively, demonstrating

that Plaintiff sought relief pursuant to that agreement in the past.  And, "A

constitutionally protected property interest in renewal of (a rental

agreement) would arise from the normal practice in private housing. . . not to

terminate a tenancy, despite the ending of a lease (or rental agreement) term,

until there is good cause to do so."  Mitchell v. U.S. Dept. of Housing &

Urban Development , 569 F. supp. 701 (N.D. Cal. 1983).   Plaintiff's wrongful

eviction was not "good cause" for non-renewal of Plaintiff's rental

agreement.

**B. PLAINTIFF CAN CLEARLY DEMONSTRATE IRREPARABLE HARM**

Plaintiff has suffered irreparable harm since his wrongful eviction in 2003

and continues to suffer irreparable harm presently, everyday.    Since his

eviction in 2003, Plaintiff's life has changed forever.   The eviction affected

both his personal and professional life, but the greatest or most profound

effect was on his personal life.   The eviction left Plaintiff homeless, and but

for his mother's home and *heart* in Los Angeles, he would have remained

that way, i.e., homeless.   "Clearly, loss of a home is a serious injury."  Alcaraz

v. Wachovia Mortgage FSB, 592 F. Supp. 2d 1296, 1301 (E.D. Cal. 2009).

Plaintiff did not have the wherewithal to obtain a new home or residence by any means, e.g., purchase, lease, or rent, based on the lack of sufficient finances . At the time of his eviction, he was still in the process of building his law practice after moving here from the District of Columbia in 1999).

"It is settled beyond the need for citation. . . .that a given piece of property is considered to be unique, and its loss is always an irreparable injury." United Church of the Medical Ctr. V. Medical Ctr. Comm'n, 689 F. 2d 693 (7th Cir. 1982). Also, "The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute." Basicomputer Corp. v. Scott, 973 F.2d 507, 512 (6th Cir. 1992).

Thusfar, Plaintiff still, since being evicted in 2003, has not been able, financially, to obtain another home or law office. Although his mother's home suffice to eliminate complete homelessness, and to provide a place to eat and sleep ( and other amenities), it does not provide one of the most fundamental attributes of a "real" home, that is, "privacy". And, this goes hand in hand with the fundamental necessity for a real "home" of a single person, again, "privacy". A house is not always a "home".

14

In order to try and serve the few clients that Plaintiff has, Plaintiff has had to improvise by utilizing public facilities, at the convenience and hours of the facilities. Consequently, Plaintiff suffers irreparable harm daily, both personally and professionally. It is truly economic imprisonment, and it was legally and factually caused by the Defendants in this case.

Even if Plaintiff wanted to try and rent or lease another office in Los Angeles or Ventura County (and it would be Ventura), the high rents are simply beyond Plaintiff's ability to afford or pay. "Southern California's economic recovery may be halting and tepid, but young workers gaining new employment, a demand for apartment living and scarce construction of units are creating a rental squeeze in the region, according to a report released Wednesday by USC's Lusk Center for Real Estate." L.A. Times, "Southland rental market getting more expensive", April 12, 2012. "Rents are expected to rise throughout the region over the next two years, with L.A. County headed for a big increase given the dearth of open units available to tenants. 'For investors, it's a good thing; for renters, it's a bad thing,' said Richard Green , a professor and director of the Lusk Center. 'Rental affordability is a huge problem in coastal California----in San Diego, Orange and L.A. counties,' Green said. 'If you are a typical renter, you are paying too much money for

your rent in the sense that it is putting a real stress on you financially.' " Id.

"Rents are surging from New York to Los Angeles." L.A. Times, "Surging

Rents raise a new housing hurdle," May 6, 2012. "In certain markets, it is

now cheaper to own a home than rent." Id. "Even for those with better

jobs, paying rent can be difficult." Id.


### C. BALANCE OF HARDSHIPS/PUBLIC INTEREST

The balance of hardships clearly favor plaintiff because the

government (to include the trustee, Defendant Sellers) , with its vast resources,

will not miss the loss of possession of the property in question until a decision on

the merits, and since it is already administering the property, in terms of

maintenance, it would simply maintain the status quo in that regard, even with

Plaintiff's re-possession of the premises.   On the other hand, Plaintiff will

continue to suffer irreparable harm, in both his personal life and professional life,

absent possession of the premises.

As for the public interest, this is a civil rights-racial discrimination case, where

Plaintiff has alleged that he was wrongfully evicted from his home-law office and

that the wrongful eviction was based on racial discrimination.   Plaintiff will adopt

the reasoning of judge Harold H. Greene of the United States District Court for the

District of Columbia in <u>Brown v. Artery Organization, Inc.</u>, 654 F. Supp. 1106,
1119 (1987), where he states, "since the early 1960s, the Congress has made
eradication of discrimination in all facets of public life, including housing, a
priority to which many otherwise private interests must give way.   Based upon
that strong public policy, the Court concludes that the public interest will most
readily be served if prevention of the spread of racial discrimination in housing is
given priority weight.  This is most appropriately accomplished if allegations of
race discrimination in housing which *prima facie* have a likelihood of being
meritorious, are allowed fully to be developed at trial."   (Emphasis in original).

## CONCLUSION

For the foregoing reasons,  Plaintiff moves the Court for a TRO to restrain the
Defendants from selling, leasing, renting, or otherwise transferring possession
and/or ownership of the property located at 1019 E. Santa Clara Street, in
Ventura, CA, 93001,  until a decision on the merits; and to transfer possession to
Plaintiff or allow Plaintiff to re-possess the same  said premises immediately, or as
soon as possible, and to issue a show cause order to Defendants to demonstrate
why injunctive relief should not be granted for the same; and for the other and
remaining relief identified in this motion; and for any other appropriate relief

1  found necessary and appropriate by the Court  to provide Plaintiff with complete

2  injunctive relief .

3

4       Pursuant to 28 U.S.C.  1915(a) , a bond  requirement is waived .

5

6

7

8  *July 1, 2012*

9  Date                                    LAURACK D. BRAY

10                                          Plaintiff Pro Se

11

12

13            **NOTICE TO COURT  RE:  EX PARTE TRO**
              **PURSUANT  TO LR 7-19**

14

15       Plaintiff hereby gives Notice to the Court that pursuant to  LR-19,  that the

16  memorandum, reasons for seeking the TRO, points and authorities, and proposed

17  ex parte order (attached) are included herein.  As far as Plaintiff has been able to

    understand, the last known counsel for some of the defendants are as follows:

18
    For  Federal Defendants:              For  State Defendants:
19

20  Leon W. Weidman                       Chief, Civil Division
    Chief,  Civil Division                California Attorney General Office
21  U.S. Attorney's Office, Los Angeles    300 South Spring Street
22  Room 7516,  Federal Building           Los Angeles, CA  90013
    300 North Los Angeles  Street        (213)  987-2000
23  Los  Angeles, CA  90012
24  Tel.: (213) 894-2404

25
    E-mail for R. Monteleone
26  Assistant U.S. Attorney – robby.monteleone@usdoj.gov

27

28
                                18

## LR 7-19.1 NOTICE

   Pursuant to LR 7-19.1, Plaintiff notifies the Court that he orally and in person advised counsel for the federal Defendants, Robyn-Marie Lyon Monteleone, Assistant Division Chief, Civil Rights Unit Chief, Civil Division, U.S. Department of Justice, U.S. Attorney's Office, Los Angeles, on June 29, 2012, about 12 noon, of the date and substance of the proposed ex parte application and that on the same said date and around the same said time, Plaintiff attempted to secure a representative counsel for the state Defendants by visiting the California Attorney General's Office in Los Angeles.  I requested the name of the Chief of the Civil Division from the clerk, but she refused to provide a name; and instead summoned another person, who gave his title as supervisory deputy attorney general and whose name was Felix Leatherwood.   I informed him of the date and that I would be filing an application for an ex parte TRO and that one of the Defendants in the Complaint was the Chief Judge of the California Supreme Court (in her position as Chair of the Judicial Council of California). He responded that sometimes the Attorney General's Office represents the Chief Judge and sometimes it doesn't. He suggested calling the Chief Judge's office , but refused to provide a telephone number. So , he's the contact person for Plaintiff's attempt to contact counsel for the state Defendants. He was informed of the proposed TRO, and he said that the Office sometimes represents the Chief Judge, and the Attorney General, I believe, would also represent the California judges.  Ms. Monteleone said that the U.S. Attorney would probably oppose the application , but that she did not know at this time.  Mr. Leatherwood had no response.


I declare under penalty of perjury that the foregoing is true and correct.

July 1, 2012
Date

LAURACK D. BRAY

U. S. Department of Justice

**United States Attorney**
**Central District of California**

United States Courthouse
312 North Spring Street
Los Angeles, California 90012

March 7, 2008

Laurack D. Bray
P.O. Box 611432
Los Angeles, CA 90061-1432

Re: <u>Citizen Complaint</u>

Dear Mr. Bray:

This will acknowledge receipt of your letter/complaint report received June 25, 2007.

After reviewing and considering its contents, this office has determined that it will be unable to proceed on this matter.  The United States Attorney's Office does not conduct criminal investigations.

Complaints regarding the conduct of courts are strictly handled by the department where the courts fall under jurisdiction.  Whether it be the state or federal court system.  To file a complaint against a judge of the state of California, you should submit a complaint form to:

The Commission on Judicial Performance
455 Golden Gate Ave., Suite 14400
San Francisco, CA 94102-3660

they may also be reached by phone at (415) 557-1200 or on their website at:

www.courtinfor.ca.gov.courtadmin.otheragencies.htm

For a complaint against the federal judge, this is covered under Title 28, U.S. Code, Section 351(a).  For more information you can go to:

www.uscourts.gov

Thank you for your inquiry and this office regrets it is unable to be of further assistance.

Sincerely,
Citizen Complaint Section

EXHIBIT #1



**U. S. Department of Justice**

*United States Attorney*
*Central District of California*

United States Courthouse
312 North Spring Street
Los Angeles, California 90012

January 28, 2011

Laurack D. Bray
P.O. Box 611432
Los Angeles, CA 90061

      Re: <u>Citizen Complaint</u>

Dear Mr. Bray:

This letter acknowledges receipt of your documents received January 24, 2011 and various other dates.

This office has reviewed the contents of your letter/complaint and has determined that there is no evidence of a federal violation and appears civil in nature.

Please be advised that this agency <u>does not</u> conduct investigations, represent clients, answer legal questions or give legal advice, therefore we consider this matter closed.

Thank you for your inquiry and this office regrets it is unable to be of further assistance.

Sincerely,

Citizen Complaint Section

EXHIBIT # 1A

**D6**  WEDNESDAY, JUNE 4, 2008                                          LOS ANG

# Agencies begin inquiry in Mayo case

### Former advisor to basketball star is said to be focus of tax evasion and fraud probe.

**By Ben Bolch**
*Times Staff Writer*

The FBI, IRS and U.S. attorney's office have begun a joint investigation into potential income tax evasion and fraud stemming from the alleged misuse of charitable organization funds by basketball star O.J. Mayo's former advisor, an attorney familiar with the investigation said Tuesday night.

"They seem to have made a high priority out of this and seem very eager to work it," said Anthony Salerno, a Los Angeles criminal attorney representing Louis Johnson, a former Mayo confidant.

Johnson alleges L.A. events promoter Rodney Guillory accepted more than $200,000 in cash and benefits from Bill Duffy Associates Sports Management and funneled a portion of that money to Mayo before and during his one season at USC.



O.J. Mayo

Salerno said criminal charges were unlikely but "theoretically" possible to be filed against Johnson, an unemployed former sportswriter who made his accusations against Mayo and Guillory last month in an ESPN "Outside the Lines" report.

The inquiry is expected to last at least several months, Salerno said, and would focus on allegations "stemming from the original interview that Louis gave ESPN. It's fair to say that for now, that's the starting point. They may very well find more things."

An agent with the California attorney general's office said last week that his organization



**JOY AND WORRY:** *Kyle Skipworth, left, of Riverside Poly at eventful Thursday, with the draft and Spencer heading back to A*

# Family is dealing with confli

[Skipworth, from Page D1]
son here, but I've got a another son who's leaving and I might never see him again," Spencer Sr. said. "It's both happy and sad."

Kyle is a 6-foot-3, 195-pound left-handed-hitting catcher who batted .543 for this season. He hit 13 home runs and drove in 47 runs in 30 games.

During one stretch, he recorded a state-record 18 consecutive base hits, while reaching base safely in 25 plate appearances in a row.

Scouts are fond of his smooth swing, raw power and ability to hit to all fields. Despite playing catcher full time for only two years, he has displayed natural abilities and instincts behind the plate.

Skipworth flew to Washington, D.C., last weekend for a workout with the Nationals, who have the No. 9 overall pick in the draft. He performed solidly, according to his father, launching eight home runs, including one that landed 21 rows up in the right-center field bleachers.

Washington's assistant general manager is former Angels catcher Bob Boone, who is very high on Skipworth.

"He's got a real good fancy for me," Kyle said. "I guess I'm in good graces."

Wherever he winds up this

**2008 MLB DRAFT**
When: Thursday and Friday.
TV: Thursday, 11 a.m., ESPN2

tour of duty in November. As a specialist in Bravo Company 2-149th General Support Aviation Battalion, he was assigned to protect former Iraqi Prime Minister Ibrahim al-Jaafari.

When he returned from overseas, his wife served him with divorce papers. They had a 6-month-old son at the time and two daughters, now 3 and 5. His parents and siblings helped him get back on his feet.

"I'm not the same guy anymore. I have a lot more patience," Spencer Jr. said. "I was always thinking, 'Let's do this now.' It's hard to explain what war does to someone, you couldn't put it into words."

Spencer was scheduled to fly back to Oklahoma on Monday, but changed his plans so he could be with his brother when he was awarded the Gatorade national player of the year award Tuesday night at a hotel in Rancho Cucamonga.

"I'm real proud of him," Spencer Jr. said Tuesday afternoon. "It's amazing how well he's grown up and how well he's developed on the field. . . . He has kept level-headed and stayed to our family values and

EXHIBIT #2

Case 2:12-cv-05704-CLK

The United States Attorney's Office

# Eastern District of New York



[Back to Press Releases - Main Page]

United States Attorney's Office
Eastern District of New York

Robert Nardoza
Public Affairs Officer

(718) 254-6323
Robert.Nardoza@usdoj.gov

---

**FOR IMMEDIATE RELEASE**                    **July 13, 2007**

## PRESS RELEASE

### JAZZ PHARMACEUTICALS, INC. AGREES TO PAY $20 MILLION TO RESOLVE CRIMINAL AND CIVIL ALLEGATIONS IN "OFF-LABEL" MARKETING INVESTIGATION

*Jazz Subsidiary Orphan Medical, Inc. Pleads Guilty to Illegally Marketing Prescription Medication Xyrem, also known as "GHB," and Pays $17.2 Million in Penalties and Victim Compensation*

*Jazz and Orphan to Pay an Additional $2.8 Million through a Civil Settlement Agreement with the United States*

BROOKLYN, NY -- Jazz Pharmaceuticals, Inc. ("Jazz") has agreed to pay $20 million in penalties and victim compensation to resolve parallel criminal and civil investigations conducted by the United States Attorney's Office for the Eastern District of New York relating to the illegal marketing practices of its wholly-owned subsidiary Orphan Medical, Inc. (Orphan). As part of this resolution, Orphan pleaded guilty this morning to felony misbranding, in violation of the Food, Drug, and Cosmetic Act (21 U.S.C. §§ 331(a) and 333(a)(2)) in connection with its illegal promotion of the prescription medication Xyrem, also known as gamma-hydroxybutyrate or "GHB," for unapproved uses. GHB is a powerful and fast-acting central nervous system depressant that has been subject to abuse as a recreational drug and is classified by the Department of Health and Human Services (HHS) as a "date rape" drug. The guilty plea proceeding was held before United States District Judge Eric N. Vitaliano.

The criminal misbranding scheme induced physicians throughout the country to write prescriptions for Xyrem that were not reimbursable by private health insurers or public insurance programs like Medicare and Medicaid, and caused millions of dollars of losses to these insurers. Pursuant to a non-prosecution agreement with the United States, Jazz has agreed

EXHIBIT #3

6/11/2011



**United States Attorney**
**District of New Jersey**

FOR IMMEDIATE RELEASE
November 5, 2010
www.justice.gov/usao/nj

CONTACT: Rebekah Carmichael
Office of Public Affairs
(973) 645-2888

## SCHEME TO DEFRAUD GOVERNMENT ON RECONSTRUCTION CONTRACTS LEADS TO CRIMINAL CHARGES AND CIVIL PENALTIES FOR LOUIS BERGER GROUP, INC.

### *Two Former High-level Employees Plead Guilty; Company Enters into Deferred Prosecution Agreement, Agrees to Pay Over $69 Million in Criminal Penalties and Civil Settlement*

NEWARK, N.J. - The Louis Berger Group, Inc. (LBG), a New Jersey-based engineering consulting company awarded millions in reconstruction contracts in Iraq and Afghanistan, has resolved criminal and civil fraud charges related to its international work on behalf of the United States Agency for International Development (USAID) and the U.S. Department of Defense. Paul J. Fishman, U.S. Attorney for the District of New Jersey, Rod J. Rosenstein, U.S. Attorney for the District of Maryland, and Tony West, Assistant Attorney General of the Civil Division of the Department of Justice, announced the developments today.

The components of the settlement include:

- a Deferred Prosecution Agreement (DPA), pursuant to which the U.S. Attorney's Office in New Jersey will suspend prosecution of a criminal Complaint charging LBG with a violation of the Major Fraud Statute; in exchange, LBG will, among other things, pay $18.7 million in related criminal penalties; make full restitution to USAID; adopt effective standards of conduct, internal controls systems, and ethics training programs for employees; and employ an independent monitor who will evaluate and oversee the company's compliance with the DPA for a two-year period;

- a civil settlement that requires the company to pay the government $50.6 million to resolve allegations that LBG violated the False Claims Act by charging inflated overhead rates that were used for invoicing on government contracts; and

- an administrative agreement between LBG and USAID, which was the primary victim of the fraudulent scheme.

An outside, independent monitor will evaluate and oversee LBG's compliance with the agreement. The monitor will be selected by the U.S. Attorney's Office for the District of New Jersey, consistent with U.S. Department of Justice guidelines, after a review of monitor candidates and in consultation with the company.

In addition, two former senior LBG employees pleaded guilty this morning to their roles in the scheme. Salvatore Pepe, LBG's former Chief Financial Officer, and Precy Pellettieri, the

*EXHIBIT #4*

bottom line. This criminal conduct sends the wrong message to the world about what we stand for as a nation. Today's guilty pleas, together with the agreements committing LBG to the highest standards of corporate conduct, send the right message: it is just as intolerable to steal our government's money overseas as it is here at home."

Donald A. Gambatesa, USAID Inspector General, described the agreement "as the culmination of years of investigative and prosecutorial effort that underscores our determination to guard taxpayer dollars against criminal schemes at home and abroad."

"As part of the International Contract Corruption Initiative, the FBI is committed to the prevention of waste, fraud, and abuse in conjunction with reconstructive efforts in Afghanistan and Iraq," said Michael B. Ward, Special Agent In Charge of the FBI's Newark division. "The continuance of fair and honest efforts to develop much needed infrastructure in those countries is a critical component to supporting our country's objectives, and subsequently supporting our troops. Individuals and companies involved in these efforts who seek to profit through fraud make a conscious decision to place profits before patriotism, and dollars above civic duty."

U.S. Attorney Fishman credited special agents of USAID, Office of Inspector General, under the direction of Special Agent in Charge ███████████; the FBI, under the direction of Special Agent in Charge Michael B. Ward; the U.S. Department of Defense, Defense Criminal Investigative Service, under the direction of Special Agent in Charge Edward T. Bradley; and the Office of the Special Inspector General for Iraq Reconstruction, under the direction of Special Inspector General Stuart W. Bowen Jr., with the investigation leading to today's agreement and guilty pleas. He also thanked USAID for its cooperation with the investigation.

The government is represented regarding the criminal charges by Thomas Eicher, Deputy Chief, and Assistant U.S. Attorneys Lisa Rose, Scott B. McBride, and Joyce Malliet of the New Jersey U.S. Attorney's Office Criminal Division in Newark.

The case against LBG came to light when a former employee who worked in its accounting department filed a whistleblower lawsuit in the District of Maryland charging LBG with several violations of the civil False Claims Act. Under the *qui tam* or whistleblower provisions of the False Claims Act, a private party can file an action on behalf of the United States and receive a portion of the government's recovery.

 The government's civil investigation, led by the Justice Department, Civil Division and U.S. Attorney's Office for the District of Maryland, examined LBG's accounting from July 1, 1991, to June 30, 2008. The false claims uncovered by the civil investigation included LBG's mischarging a portion of its headquarters costs and part of its Washington office costs to overhead accounts so they appeared to have originated in LBG's government international division. In addition to mischarging USAID, the false claims also inflated billings on contracts performed overseas for the United States Army and United States Air Force. 

-3-

EXHIBIT #4

Camp convictions, sentences may be overturned—ajc.com                    Page 1 of 3



🖶 Print this page   ⊡ Close

# Camp convictions, sentences may be overturned

By Steve Visser
The Atlanta Journal-Constitution

11:07 p.m. Thursday, December 2, 2010

 

A federal investigation into former U.S. District Judge Jack Camp's admitted drug use and alleged bias against African-Americans may mean new trials or sentences for some people adjudicated in his courtrooms.

U.S. Attorney Sally Quillian Yates announced Thursday her office is conducting an investigation on how Camp's behavior and biases may have undermined justice.



Camp, 67, resigned as a federal judge and pleaded guilty Nov. 19 to a felony drug charge and two misdemeanors. The charges stemmed from a sex scandal involving cocaine, marijuana, prescription narcotics, guns and 27-year-old exotic dancer Sherry Ann Ramos, with whom the married judge had an affair between May and September 2010.

Yates said Camp had admitted using drugs during that period but denied using them before the affair or during court business. The investigation revealed no other drug use, Yates said.

She said the U.S. Attorney's Office "would not oppose" any defendant's request for a new sentencing if it was handed down during the five-month period Camp has admitted to using drugs. She said she did not have an opinion on how much weight to give the charges of racial bias.



But Stephanie Kearns, executive director of the Federal Defender Program in Atlanta, said it was the allegations of racial bias that might prove most vexing for federal prosecutors. Her office already identified a few cases in which its lawyers believe Camp may have shown prejudice against African-Americans during the course of a trial. That could mean a motion for a new trial in some cases, she said.

"We've already talked about some in our office," she said. "We're pulling the records and the (trial) transcripts."

Camp, through his attorney, said he would defend "any decision he has rendered where a defendant may assert any sort of impairment or bias."

Bill Morrison's statement to The Atlanta Journal-Constitution Thursday night said, in part, "While Mr. Camp understands the government must take appropriate steps to ensure our judicial system is free of bias, none occurred in Judge Camp's courtroom. Again, Jack Camp has assisted the government in this review to the fullest degree possible."

EXHIBIT #5

# FindLaw. FOR LEGAL PROFESSIONALS

United States Court of Appeals,Ninth Circuit.

**UNITED STATES v. STRINGER III**

UNITED STATES of America, Plaintiff-Appellant, v. J. Kenneth STRINGER, III; J. Mark Samper; William N. Martin, Defendants-Appellees.

No. 06-30100.

Argued and Submitted Sept. 26, 2007. -- July 31, 2008.

Before: MARY M. SCHROEDER, BARRY G. SILVERMAN and JAY S. BYBEE, Circuit Judges.

Karin J. Immergut, United States Attorney; Hannah Horsley, Assistant United States Attorney; and Kelly A. Zusman, Assistant United States Attorney, Portland, OR, for plaintiff-appellant United States of America.Janet Lee Hoffman, Hoffman Angeli LLP, Portland, OR, for defendant-appellee J. Kenneth Stringer, III.Ronald H. Hoevet, Hoevet, Boise & Olson, P.C., Portland, OR, for defendant-appellee Mark Samper.John S. Ransom and Kendra Matthews, Ransom Blackman LLP, Portland, OR, for defendant-appellee William Martin.

ORDER

The opinion in this matter filed on April 4, 2008, and published at United States v. Stringer, 521 F.3d 1189 (9th Cir.2008), is amended as follows:

On slip op. 3549 [521 F.3d at 1191], replace the listed counsel, lines 3-10, with the following:

Karin J. Immergut, United States Attorney; Hannah Horsley, Assistant United States Attorney; and Kelly A. Zusman, Assistant United States Attorney, Portland, Oregon, for plaintiff-appellant United States of America.

Janet Lee Hoffman, Hoffman Angeli LLP, Portland, Oregon, for defendant-appellee J. Kenneth Stringer, III.

Ronald H. Hoevet, Hoevet, Boise & Olson, P.C., Portland, Oregon, for defendant-appellee Mark Samper.

John S. Ransom and Kendra Matthews, Ransom Blackman LLP, Portland, Oregon, for defendant-appellee William Martin.

On slip op. 3550 [521 F.3d at 1191], replace the first full paragraph with the following:

Accepting the district court's factual findings under the clear error standard, we hold that the government's conduct does not amount to a constitutional violation under either the Fourth or Fifth Amendments. We vacate the dismissal of the indictments because in a standard form it sent to the defendants, the government fully disclosed the possibility that information received in the course of the civil investigation could be used for criminal proceedings. There was no deceit; rather, at most, there was a government decision not to conduct the criminal investigation openly, a decision we hold the government was free to make. There was nothing improper about the government undertaking simultaneous criminal and civil investigations, and nothing in the government's actual conduct of those investigations amounted to deceit or an affirmative misrepresentation justifying the rare sanction of dismissal of criminal charges or suppression of evidence received in the course of the investigations.

On slip op. 3556 [521 F.3d at 1194-95], replace the last sentence of the second paragraph with the following:

Rosenbaum represented Meussle, as well as Samper and FLIR.

On slip op. 3559 [521 F.3d at 1196], replace the citation sentence in the first partial paragraph with the following:

See, e.g., United States v. Carriles, 486 F.Supp.2d 599, 615, 619 (W.D.Tex.2007), appeal pending, No. 07-50737, 2008 WL 3522422, [541] F.3d [344] (5th Cir.2008); United States v. Rand, 308 F.Supp. 1231, 1233, 1237 (N.D.Ohio 1970).

On slip op. 3568 [521 F.3d at 1201], insert the following as the first full paragraph:

The panel shall retain jurisdiction over any subsequent appeal in this matter.

Defendant-Appellee Martin's Petition for Rehearing En Banc, Defendant-Appellee Stringer's Petition for Rehearing and Suggestion for Rehearing En Banc, and Defendant-Appellee Samper's Petition for Rehearing En Banc are denied. No subsequent petition for rehearing or rehearing en banc may be filed.

OPINION

I. Introduction

The United States appeals from a final order of the district court dismissing criminal indictments against three individual defendants charging counts of criminal securities violations. The dismissal was premised on the district court's conclusion that the government had engaged in deceitful conduct, in violation of defendants' due process rights, by simultaneously pursuing civil and criminal investigations of defendants' alleged falsification of the financial

EXHIBIT #6

records of their high-tech camera sales company. Foreseeing the possibility of an appeal, the district court held that the indictments must be dismissed, but ruled in the alternative that, should there be a criminal trial, all evidence provided by the individual defendants in response to Securities and Exchange Commission ("SEC") subpoenas should be suppressed. See United States v. Stringer, 408 F.Supp.2d 1083 (D.Or.2006).

The court also suppressed evidence relating to the "Swedish Drop Shipment," an allegedly fraudulent accounting entry. The district court reasoned that the government had improperly interfered with, or intruded into, the attorney-client relationship of one of the defendants by accepting incriminating evidence about the entry from a defense attorney. The attorney had an apparent conflict of interest because she represented the corporation as well as an individual defendant.

Accepting the district court's factual findings under the clear error standard, we hold that the government's conduct does not amount to a constitutional violation under either the Fourth or Fifth Amendments. We vacate the dismissal of the indictments because in a standard form it sent to the defendants, the government fully disclosed the possibility that information received in the course of the civil investigation could be used for criminal proceedings. There was no deceit; rather, at most, there was a government decision not to conduct the criminal investigation openly, a decision we hold the government was free to make. There is nothing improper about the government undertaking simultaneous criminal and civil investigations, and nothing in the government's actual conduct of those investigations amounted to deceit or an affirmative misrepresentation justifying the rare sanction of dismissal of criminal charges or suppression of evidence received in the course of the investigations.

We also reverse the order excluding evidence received from the conflicted attorney. We do so because the government advised the attorney of the existence of a potential conflict and did not interfere with the attorney-client relationship.

II. Background

A. The concurrent SEC civil and U.S. Attorney criminal investigations

Prior to the criminal action that forms the basis of this appeal, the SEC began investigating the defendants, J. Kenneth Stringer, III, J. Mark Samper, and William N. Martin, and their company for possible civil securities fraud violations. The company was FLIR Systems, Inc. ("FLIR"), an Oregon corporation headquartered in Portland that sells infrared and heat-sensing cameras for military and industrial use. The SEC began the investigation on June 8, 2000. About two weeks later, the SEC held the first of a series of meetings with the Oregon United States Attorney's Office ("USAO") to coordinate the ongoing SEC investigation with a possible criminal investigation. An SEC Assistant Director and an SEC Staff Attorney met with the supervisor of the white collar crime section of the USAO to discuss the possibility of opening a criminal investigation. The meeting apparently convinced the USAO supervisor to investigate. Within days, the USAO and the Federal Bureau of Investigation ("FBI") opened a criminal investigation.

Federal securities laws authorize the SEC to transmit evidence it has gathered to the USAO to facilitate a criminal investigation by the USAO. See 15 U.S.C. §§ 77t(b), 78u(d). To gather evidence for its criminal investigation, the Oregon USAO in June of 2000 sent a letter to the SEC (the "Access Letter") requesting access to the SEC's non-public investigative files, and the SEC promptly granted access.

The civil and criminal investigations proceeded in tandem and the SEC continued to meet and communicate with the USAO and FBI. The SEC turned over documents the SEC collected through its civil investigation.

At the beginning of the criminal investigation, the USAO identified two of the three defendants, FLIR's former CEO, Stringer, and former CFO, Samper, as possible targets, and named them in the USAO's Access Letter to the SEC. A few months later, in October 2000, the Assistant United States Attorney ("AUSA") assigned to the case made a list of the subjects of the investigation and placed asterisks and the comment "knew what [was] going on" next to the entries for Samper and Stringer. A month later, the AUSA stated in his handwritten notes that Stringer had "lied [about] his role in" the company. In April 2001, an e-mail from the SEC Staff Attorney to the SEC Assistant Director stated the AUSA "define[d][the] targets as Ken Stringer and Mark Samper."

The district court concluded that the third defendant, Martin, former VP of Sales, was also an early potential target of the criminal investigation. Martin appears on the AUSA's early list of the subjects of the investigation above the comment "knew pushing up sales." During a January 2001 meeting, the SEC advised the USAO and FBI that FLIR was blaming Stringer and Martin for the fraudulent conduct at the heart of the investigation.

Early in the criminal investigation, the USAO decided the investigation should remain confidential. At an October 2000 meeting between the SEC, USAO, and FBI, the AUSA advised that the evidence collected by the SEC might support criminal wire fraud charges. Nonetheless, an internal FBI memo issued in late October stated that the AUSA had concluded, based on the defendants' cooperation with the SEC at that point, that the SEC should investigate "without the assistance or inclusion of the FBI." At the January 2001 meeting between the SEC, FBI, and USAO, the SEC revealed that FLIR was cooperative and was providing evidence that was damaging to Stringer and Martin.

By June 2001, the USAO was not yet ready to convene a grand jury and issue indictments. The SEC and USAO believed that FLIR and defendant Samper would settle with the SEC so long as the U.S. Attorney was not directly involved. During a December 2001 phone conversation between the AUSA assigned to the case and the SEC Assistant Director, the AUSA continued to believe it was "premature [sic] to surface" and that the presence of an AUSA would "impede" a meeting between the SEC and defendants. During a December 2002 phone call, the SEC and USAO decided that the USAO would not "surface", i.e., convene a grand jury and issue indictments, until the "end of Jan/early Feb" 2003.

The SEC facilitated the criminal investigation in a number of ways. The SEC offered to conduct the interviews of defendants so as to create "the best record possible" in support of "false statement cases" against them, and the AUSA instructed the SEC Staff Attorney on how best to do that. The AUSA asked the relevant SEC office, located in Los Angeles, to take the depositions in Oregon so that the Portland Office of the USAO would have venue over

EXHIBIT #6

Dewey & LeBoeuf - Bloom, Suzanne Jaffe

# Suzanne Jaffe Bloom

## Partner

Suzanne Jaffe Bloom is a partner in Dewey & LeBoeuf's Litigation Department. Ms. Bloom's practice centers on representing institutional, corporate and individual clients in white collar criminal and regulatory investigations and related proceedings; corporate internal investigations; ethics and compliance counseling; corporate governance matters; and complex commercial litigation. Before joining Dewey & LeBoeuf, Ms. Bloom served as Deputy Chief of the Long Island Criminal Division of the United States Attorney's Office for the Eastern District of New York, overseeing its corporate fraud and complex white collar matters, including commercial fraud, securities fraud and criminal tax matters. Prior to that, Ms. Bloom served as an Assistant United States Attorney for the Southern District of New York for over six years, and thereafter, as an Assistant United States Attorney for the Eastern District of New York for over two years. As a federal prosecutor, Ms. Bloom conducted numerous grand jury investigations and federal jury trials, with her primary practice dealing with white collar crime, ranging from public corruption to money laundering, tax fraud, commercial fraud and securities fraud. In addition, while a federal prosecutor for the Eastern District of New York, Ms. Bloom served as a member of the Complex White Collar/Corporate Fraud Committee and as a member of the United States Attorney's Advisory Committee.

Since joining Dewey & LeBoeuf, Ms. Bloom has represented public and privately held corporations, corporate executives and other individuals, as well as special board committees, in connection with federal and local criminal investigations and internal investigations, involving a wide variety of issues, including allegations of healthcare fraud, violations of the Foreign Corrupt Practices Act, accounting fraud, tax fraud, money laundering, official corruption, securities fraud and financial fraud. Ms. Bloom has also served as counsel to a state regulator in connection with its monitoring of several large insurance brokerage firms following a multistate investigation involving allegations of bid-rigging and other wrongdoing. In addition, Ms. Bloom has assisted organizations with the development and implementation of compliance and remediation programs.

Ms. Bloom earned a J.D. *cum laude* from Harvard Law School and graduated *summa cum laude* from the State University of New York at Binghamton, where she received a Bachelor of Science in Business Management and the Horwitz Award for Excellence in Business Management. Ms. Bloom is a member of the New York Bar and is admitted to practice before the Southern District of New York, the Eastern District of New York and the U.S. Court of Appeals for the Second Circuit.

Prior to becoming a federal prosecutor, Ms. Bloom was in private practice in Manhattan, where she represented and counseled institutional, corporate and individual clients in connection with sophisticated commercial matters, including class action and antitrust litigation.

## Representative Matters

*Dewey & LeBoeuf*

- *FCPA:* Representation of an executive of a public company with worldwide operations in connection with a Department of Justice criminal investigation of alleged violations of the Foreign Corrupt Practices Act;
- *HealthCare:* Representation of a leading public pharmaceutical care company in connection with criminal and civil investigations by US Attorney's Offices and related False Claims Act litigation;
- *Corporate Governance; Investor Litigation:* Representation of an investor in a biotechnology

*EXHIBIT # 7*

company in connection with civil litigation involving organizational governance issues;

- *Official Corruption:* Representation of a private equity firm in connection with an investigation by the New York State Attorney General's Office of allegations of official corruption;
- *Securities:* Representation of the board of directors of a public software company in connection with an internal investigation of the conduct and stock trading activities of the company's CEO;
- *Tax:* Representation of an international financial institution in connection with a federal grand jury investigation involving allegations of violations of civil and criminal tax laws;
- *FCPA; Money Laundering; Securities:* Representation of the Audit Committee of several global advertising and marketing service companies in connection with its oversight of over 40 internal investigations conducted worldwide, involving allegations of, among other things, violations of the Foreign Corrupt Practices Act, money laundering and accounting irregularities; the issuance of related financial restatements; and related SEC inquiries;
- *Fraud; Theft; Embezzlement:* Representation of a closely held corporation in connection with a federal criminal investigation involving allegations of fraud, theft and embezzlement;
- *Insurance; Compliance Monitoring:* Representation of a government agency in connection with the examination and compliance monitoring of several insurance brokerage companies in the wake of a multistate investigation of alleged wrongdoing and the resulting settlement agreements;
- *Tax; Organizational Governance; Compliance Counseling:* Representation of the Executive Committee of a large professional services firm in connection with its investigation of allegations of wrongdoing and the development and implementation of a compliance program; and
- *Ethics and Compliance Counseling:* Counseling the Audit Committee of global advertising and marketing services companies in connection with its development and implementation of worldwide compliance and remediation plans concerning, among other things, compliance with the FCPA, related antibribery laws and anti-money laundering laws, following worldwide internal investigations of related issues.

### United States Attorney's Office for the Southern District of New York

- Led investigation and successful prosecution of 15 present and former police officers and detectives with the New York City Police Department on various charges relating to their illegal tax protestor activities, including conspiracy to defraud the United States and tax evasion;
- Responsible for the successful prosecution of construction contractors and attorneys on charges of bribery relating to construction contracts with the New York City Board of Education and the School Construction Authority;
- Led investigation of corruption within the International Ladies Garment Workers Union and the Ladies Apparel Contractors Association, resulting in the conviction of several labor union officials and garment contractors on labor racketeering charges, including conspiracy and bribery;
- Responsible for the successful prosecution of a DEA Special Agent and other DEA employees on charges relating to public corruption and narcotics conspiracies; and
- Led investigation of corruption at the New York Office of the United States Immigration & Naturalization Services, resulting in arrests and convictions of INS employees and brokers on various charges, including conspiracy, bribery, trafficking in fraudulently obtained INS documents, and establishing a commercial enterprise to evade the immigration laws.

### United States Attorney's Office for the Eastern District of New York

- Led investigation of corruption at the Village of Hempstead Housing Authority ("HHA") resulting in convictions of a former HHA supervisor, the former Director of Public Relations at the Economic Opportunity Commission of Nassau County, and a local contractor on extortion, bribery and tax charges;
- Led investigation and prosecution of 53 individuals charged in connection with fraudulent

*EXHIBIT # 7*

securities offerings attempting to raise over $48 million nationwide, resulting in convictions on various counts of securities fraud and related charges;

- Led several individual and corporate investigations and successful prosecutions involving conspiracies to defraud the United States and violations of the federal tax laws;
- Led investigation and successful prosecution of individuals involved in money laundering and fraud on behalf of owners and investors of medical imaging companies; and
- Led joint federal and state investigation of a nationwide fraud perpetrated by the principals of several loan brokerages and funding companies operating out of New York, resulting in convictions of principals on several counts of conspiracy and mail fraud.

## Publications

- "Selective Waiver: Making Sense of the Confusion" (with Lisa Card), *New York Law Journal* (July 23, 2007).
- "New Risk In Employee Interviews" (with Seth C. Farber), *National Law Journal* ( July 24, 2006).
- "Shoring Up Compliance Programs In the Wake of 'Booker/Fanfan'" (with Seth C. Farber), *GC New York* (October 11, 2005).

## Speeches and Programs

- Practising Law Institute: "Internal Investigations 2009 - How to Protect Your Clients or Company" (June 9, 2009, New York, New York).
- Practising Law Institute: "Internal Investigations 2008 - Legal, Ethical & Strategic Issues" (June 10, 2008, New York, New York).
- Practising Law Institute: "Internal Investigations 2007 - Legal, Ethical & Strategic Issues" (June 12, 2007, New York, New York).
- Ethics and Compliance Officer Association - Sponsoring Partner Forum 2006: "Ask the Regulators" Panel Moderator (April 6, 2006, Santa Ana Pueblo, New Mexico).
- CLE Program Presenter: "The Roles and Responsibilities of In-House and Outside Counsel in Coordinating Multiple Government Investigations and Related Civil Litigations" (June 8, 2005, New York, New York).

## Awards and Recognition

- Named as a Super Lawyer in the 2009 and 2010 Editions of *New York Super Lawyers*
- Recipient of 2007 Burton Award for Legal Achievement

## Education

- Harvard Law School, 1988, J.D., *cum laude*
- State University of New York, Binghamton, 1985, B.S., *summa cum laude,* Recipient of the Horwitz Award for Excellence in Business Management

## Bar Admissions

- New York

## Court Admissions

EXHIBIT # 7

SYED M. JAWAID
150 CRABAPPLE DR
POMONA, CA 91767







REASON CHECKED
X Received Unsealed
☐ Received Damaged
☐ Received w/o Contents
☐ Received w/o Postage
☐ Received in Bad Condition

MR. LAURACK D. BRAY ESQ
P. O. BOX 611432
LOS ANGELES, CA 90061

Rec'd letter opened at both sides —

9006187012

---

SYED M. JAWAID
150 CRABAPPLE Drive
Pomona, CA 91767



CITY OF INDUSTRY CA 91
10 AUG 2011 PM 1 T

LOOK
LIKE
1 END
IS OPEN
MARY

Mr Laurack D. Bray Esq.
P. O. Box 611432
Los Angeles, CA 90061

9006147012

EXHIBIT # 8

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

LAURACK D. BRAY,                          NO.

       Complainant,

v.

DEPARTMENT OF JUSTICE, et.al.

       Defendants.

## AFFIRMATION OF SYED JAWAID

I, Syed Jawaid, do hereby declare and affirm, that if called upon as a witness, I would testify that:

1. I am 66 years of age; and I am currently retired from federal government employment with the Department of Homeland Security.

2. I am Indian and my religious faith is Muslim.

3. I retained Attorney Laurack D. Bray to represent me in 2011; and pursuant to that representation, I mailed several letters to attorney Bray between 2011 and 2012. I used the U.S. Postal Service to mail the letters. I mailed each letter at the LaVerne, CA post office, with the zipcode 91750 . With each letter that I mailed to attorney Bray, I assured that it was sealed completely, on both sides and top ( including the top lip of the envelope) and bottom .

4. I was later told by attorney Bray that he had received at least one or more of my letters opened. With at least one letter, he contacted

1

EXHIBIT # 9

me the next day after receiving the letter  to inform me that the letter was opened when he received it.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.


Executed on ___June 19, 2012___ , 2012 at Pomona , California

_____

Syed  Jawaid

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

LAURACK D. BRAY,                    NO. _____

          Complaint,

v.

DEPARTMENT OF JUSTICE, et.al.

          Defendants.

_____

# AFFIRMATION OF LAURACK D. BRAY

I, Laurack D. Bray, do hereby declare and affirm, that if called upon as a witness, I would testify that:

1. I am a 62 year old Black or African American attorney. My law office and practice since 1999 was primarily in Ventura, California, until I was forced to re-locate to Los Angeles based on a wrongful eviction from my home-law office in Ventura in 2003.

2. At the time that I was wrongfully evicted from my home-law office in 2003, I intended to renew or continue my rental agreement and continue to rent and possess the premises located at 1019 E. Santa Clara Street in Ventura, CA, 93001. I specifically liked my home-office because of the structural make-up of the premises themselves, e.g., high ceiling, but also because of the location, e.g., near downtown and the fairgrounds.

3. Even after having to re-locate to Los Angeles, I continued to believe and feel that my Ventura home-law office was my real home, and I

1

EXHIBIT# 10

continued to vote in Ventura (after initially registering to vote there) in every election since my leaving Ventura, even though it required traveling from L.A. to Ventura. I have always believed that I would return to Ventura and resume my lifestyle as it was prior to my eviction.

4. I have been unable to obtain another home of my own or another law office.

5. I have filed several criminal complaints in the U.S. Attorney's Office in Los Angeles, on behalf of myself and on behalf of others; and, in most of the complaints, I have been and considered myself a victim, as well as a complainant. And, in all cases that I believed that I was a victim, I intended to seek restitution if a prosecution and conviction was obtained. And, in most, if not all cases, I intended to seek injunctive relief as part of the restitution; and, the most specific injunctive relief that I sought was and is the return of possession of the premises and property in Ventura, CA.

6. With the latest Complaints (2) that I filed in the U.S. Attorney's Office in Los Angeles in July 26, 2011, I also intend to seek restitution; and as part of that restitution, I will seek injunctive relief and a return of possession of the Ventura premises.

7. On or about May 31, 2011, I discovered that the Ventura property was not being occupied or was vacant ( I could see inside the property through two large windows that face the street) and apparently was undergoing renovations. This observation affected the timing of the serving and filing of subsequent complaints, including the above-mentioned ones, i.e., July 26, 2011. Prior to the July 26 Complaints, I had separately mailed and served one of the same Complaints on the FBI for investigation, on June 21, 2011. In that Complaint, I requested that the FBI seize the Ventura property in conjunction with the criminal complaint, in anticipation of my seeking restitution and injunctive relief, and re-possession of the property.

8. Neither the FBI nor the U.S. Attorney's Office have contacted me regarding either the criminal complaints or the request for a seizure of the property. And, I do not know the status of the property and

2

the government's relation to the property, and /or if anyone is exercising any possessory rights over the property?

9. During the most recent primary election last month (June, 2012), when I traveled to Ventura, CA, to vote, I visited the property once again. This time I observed that the property had been freshly painted (when I last visited the property, it had not been painted) and I saw what appeared to be curtains on the walls. Thereafter, I visited the Assessor's Office and discovered that there is a trustee over the property, or that the property is being held in trust. I learned that the trustee is Steven R. Sellers, now one of the Defendants here.

10. I still have not heard from either the FBI or the U.S. Attorney's Office.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on _June 28_____, 2012 at Los Angeles , California

LAURACK D. BRAY

3

**CALIFORNIA ASSOCIATION OF REALTORS®**

**RESIDENTIAL LEASE OR MONTH-TO-MONTH RENTAL AGREEMENT**

Landlord: **PROS TEAM PROP. MGMT. AND HOI NGUYEN** ("Landlord") and
Tenant: **LAURINE D. GRAY** ("Tenant") agree as follows:

1. **PROPERTY:**
   A. Landlord rents to Tenant and Tenant rents from Landlord, the real property and improvements described as: **1019 "A"** **_____ ST, VENTURA, CA. 43001** ("Premises").
   B. The following personal property is included: **STOVE AND _____**

2. **TERM:** The term begins on (date) **_____** ("Commencement Date"). (Check A or B):
   ☑ A. Month-to-month: and continues as a month-to-month tenancy. Either party may terminate the tenancy by giving written notice to the other at least 30 days prior to the intended termination date, subject to any applicable local laws. Such notice may be given on any date.
   ☐ B. Lease: and shall terminate on (date) **_____** at **_____** AM/PM.
   Any holding over after the term of this Agreement expires, with Landlord's consent, shall create a month-to-month tenancy which either party may terminate as specified in paragraph 2A. Rent shall be at a rate equal to the rent for the immediately preceding month, unless otherwise notified by Landlord, payable in advance. All other terms and conditions of this Agreement shall remain in full force and effect.

3. **RENT:**
   A. Tenant agrees to pay rent at the rate of $ **775** per month for the term of the Agreement.
   B. Rent is payable in advance on the 1st (or ☐ **_____**) day of each calendar month, and is delinquent on the next **1st DAY 5:00 PM**
   C. If Commencement Date falls on any day other than the first day of the month, rent shall be prorated based on a 30-day period. If Tenant has paid one full month's rent in advance of Commencement Date, rent for the second calendar month shall be prorated based on a 30-day period.
   D. **PAYMENT:** The rent shall be paid to (name) **PROS TEAM**, or at any other location specified by Landlord in writing to Tenant. at (address) **P.O. BOX 366**, **_____ CA. 93002**

4. **SECURITY DEPOSIT:**
   A. Tenant agrees to pay $ **_____** as a security deposit. Security deposit will be ☑ given to the Owner of the Premises; or ☐ held in Owner's Broker's trust account.
   B. All or any portion of the security deposit may be used, as reasonably necessary, to: (1) cure Tenant's default in payment of rent, Late Charges, NSF fees, or other sums due; (2) repair damage, excluding ordinary wear and tear, caused by Tenant or by a guest or licensee of Tenant; (3) clean Premises, if necessary, upon termination of tenancy; and (4) replace or return personal property or appurtenances. SECURITY DEPOSIT SHALL NOT BE USED BY TENANT IN LIEU OF PAYMENT OF LAST MONTH'S RENT. If all or any portion of the security deposit is used during tenancy, Tenant agrees to reinstate the total security deposit within five days after written notice is delivered to Tenant. Within three weeks after Tenant vacates the Premises, Landlord shall (1) furnish Tenant an itemized statement indicating the amount of any security deposit received and the basis for its disposition, and (2) return any remaining portion of security deposit to Tenant.
   C. No interest will be paid on security deposit, unless required by local ordinance.
   D. If security deposit is held by Owner, Tenant agrees not to hold Broker responsible for its return. If security deposit is held in Owner's Broker's trust account, and Broker's authority is terminated before expiration of this Agreement, and security deposits are released to someone other than Tenant, then Broker shall notify Tenant, in writing, where and to whom security deposit has been released. Once Tenant has been provided such notice, Tenant agrees not to hold Broker responsible for security deposit.

5. **MOVE-IN COSTS RECEIVED/DUE:**

| Category | Total Due | Payment Received | Balance Due | Date Due |
|---|---|---|---|---|
| Rent from **3-23-99** to **3-31-99** (date) | **206.66** | **3/22/99** | 0 | |
| *Security Deposit | **775.00** | **3/22/99** | 0 | |
| Other _____ | | | | |
| Other _____ | | | | |
| Total | | | | |

*The maximum amount that Landlord may receive as security deposit, however designated, cannot exceed two month's rent for an unfurnished premises, and three month's rent for a furnished premises.

6. **PARKING:** (Check A or B)
   ☐ A. Parking is permitted as follows: _____
   The right to parking ☐ is, ☐ is not, included in the rent charged pursuant to paragraph 3. If not included in the rent, the parking rental fee shall be an additional $ _____ per month. Parking space(s) are to be used for parking operable motor vehicles, except for trailers, boats, campers, buses or trucks (other than pick-up trucks). Tenant shall park in assigned space(s) only. Parking space(s) are to be kept clean. Vehicles leaking oil, gas or other motor vehicle fluids shall not be parked on the Premises. Mechanical work or storage of inoperable vehicles is not allowed in parking space(s) or elsewhere on the Premises.
   OR ☐ B. Parking is not permitted on the Premises.

7. **STORAGE:** (Check A or B)
   ☐ A. Storage is permitted as follows: _____
   The right to storage space ☐ is, ☐ is not, included in the rent charged pursuant to paragraph 3. If not included in the rent, storage space shall be an additional $ _____ per month. Tenant shall store only personal property that Tenant owns, and shall not store property that is claimed by another or in which another has any right, title, or interest. Tenant shall not store any improperly packaged food or perishable goods, flammable materials, explosives, or other inherently dangerous material.
   OR ☐ B. Storage is not permitted on the Premises.

8. **LATE CHARGE/NSF CHECKS:** Tenant acknowledges that either late payment of rent or issuance of a non-sufficient funds ("NSF") check may cause Landlord to incur costs and expenses, the exact amount of which are extremely difficult and impractical to determine. These costs may include, but are not limited to, processing, enforcement and accounting expenses, and late charges imposed on Landlord. If any installment of rent due from Tenant is not received by Landlord within 5 (or ☐ _____) calendar days after date due, or if a check is returned NSF, Tenant shall pay to Landlord, respectively, an additional sum of $ _____ as Late Charge and $25.00 as a NSF fee, either or both of which shall be deemed additional rent. Landlord and Tenant agree that these charges represent a fair and reasonable estimate of the costs Landlord may incur by reason of Tenant's late or NSF payment. Any Late Charge or NSF fee due shall be paid with the current installment of rent. Landlord's acceptance of any Late Charge or NSF fee shall not constitute a waiver as to any default of Tenant. Landlord's right to collect a Late Charge or NSF fee shall not be deemed an extension of the date rent is due under paragraph 3, or prevent Landlord from exercising any other rights and remedies under this Agreement, and as provided by law.

Tenant and Landlord acknowledge receipt of copy of this page, which constitutes Page 1 of _____ Pages.
Tenant's Initials ( _____ ) ( _____ )   Landlord's Initials ( _____ ) ( _____ )

THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ADEQUACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.

The copyright laws of the United States (17 U.S. Code) forbid the unauthorized reproduction of this form by any means, including facsimile or computerized formats. Copyright © 1994-1997, CALIFORNIA ASSOCIATION OF REALTORS®, INC.

**EXHIBIT #11**

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.,
a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020

PRINT DATE

OFFICE USE ONLY
Reviewed by Broker
or Designee
Date _____



Premises: _1019 E. SANTA CLARA #A_   Date: _3/22/99_

9. **CONDITION OF PREMISES:** ...nt has examined Premises, all furniture, furnishings, appliances a.. ...dscaping, if any, and fixtures, including smoke detector(s).
(Check one:)
☐ A. Tenant acknowledges that these items are clean and in operative condition, with the following exceptions _____
OR ☐ B. Tenant's acknowledgement of the condition of these items is contained in an attached statement of condition, (such as C.A.R.'s MIMO-11).
OR ☐ C. Tenant will provide Landlord a list of items which are damaged or not in operable condition within 3 (or ☐ _____) days after Commencement Date, not as a contingency of this Agreement but rather as an acknowledgement of the condition of the Premises.
OR ☐ D. Other: _____

10. **NEIGHBORHOOD CONDITIONS:** Tenant is advised to satisfy his or herself as to neighborhood or area conditions, including schools, proximity and adequacy of law enforcement, crime statistics, registered felons or offenders, fire protection, other governmental services, proximity to commercial, industrial or agricultural activities, existing and proposed transportation, construction and development which may affect noise, view, or traffic, airport noise, noise or odor from any source, wild and domestic animals, other nuisances, hazards, or circumstances, facilities and condition of common areas, conditions and influences of significance to certain cultures and/or religions, and personal needs, requirements and preferences of Tenant.

11. **UTILITIES:** Tenant agrees to pay for all utilities and services, and the following charges: _GAS AND ELECTRIC_ except _TRASH AND WATER_, which shall be paid for by Landlord. If any utilities are not separately metered, Tenant shall pay Tenant's proportional share, as reasonably determined by Landlord.

12. **OCCUPANTS:** The Premises are for the sole use as a personal residence by the following named persons only: _LAURACK D. BRAY_

13. **PETS:** No animal or pet shall be kept on or about the Premises without Landlord's prior written consent, except _NONE_

14. **RULES/REGULATIONS:** Tenant agrees to comply with all rules and regulations of Landlord which are at any time posted on the Premises or delivered to Tenant. Tenant shall not, and shall ensure that guests and licensees of Tenant shall not, disturb, annoy, endanger, or interfere with other tenants of the building or neighbors, or use the Premises for any unlawful purposes, including, but not limited to, using, manufacturing, selling, storing, or transporting illicit drugs or other contraband, or violate any law or ordinance, or commit a waste or nuisance on or about the Premises.

15. **CONDOMINIUM/PLANNED UNIT DEVELOPMENT:** ☐ (If checked) The Premises is a unit in a condominium, planned unit, or other development governed by an owner's association. The name of the owner's association is _____.
Tenant agrees to comply with all covenants, conditions and restrictions, by-laws, rules and regulations and decisions of owner's association. Landlord shall provide Tenant copies of rules and regulations, if any. Tenant shall reimburse Landlord for any fines or charges imposed by owner's association or other authorities, due to any violation by Tenant, or the guests or licensees of Tenant.

16. **MAINTENANCE:**
A. Tenant shall properly use, operate, and safeguard Premises, including if applicable, any landscaping, furniture, furnishings, and appliances, and all mechanical, electrical, gas and plumbing fixtures, and keep them clean and sanitary. Tenant shall immediately notify Landlord, in writing, of any problem, malfunction or damage. Tenant shall pay for all repairs or replacements caused by Tenant, or guests or invitees of Tenant, excluding ordinary wear and tear. Tenant shall pay for all damage to Premises as a result of failure to report a problem in a timely manner. Tenant shall pay for repair of drain blockages or stoppages, unless caused by defective plumbing parts or tree roots invading sewer lines.
B. ☐ Landlord, ☐ Tenant, shall water the garden, landscaping, trees and shrubs, except _____
C. ☐ Landlord, ☐ Tenant shall maintain the garden, landscaping, trees, and shrubs, except _____

17. **ALTERATIONS:** Tenant shall not make any alterations in or about the Premises, without Landlord's prior written consent, including: painting, wallpapering, adding or changing locks, installing antenna or satellite dish, placing signs, displays or exhibits, or using screws, fastening devices, large nails or adhesive materials.

18. **KEYS/LOCKS:**
A. Tenant acknowledges receipt of (or Tenant will receive ☐ prior to the Commencement Date, or ☐ _____):
☒ _2_ key(s) to Premises,   ☐ _____ remote control device(s) for garage door/gate opener(s).
☐ _____ key(s) to mailbox,   ☐ _____
☐ _____ key(s) to common area(s),   ☐ _____
B. Tenant acknowledges that locks to the Premises ☐ have, ☐ have not, been re-keyed.
C. If Tenant re-keys existing locks or opening devices, Tenant shall immediately deliver copies of all keys to Landlord. Tenant shall pay all costs and charges related to loss of any keys or opening devices. Tenant may not remove locks, even if installed by Tenant.

19. **ENTRY:** Tenant shall make Premises available to Landlord or representative for the purpose of entering to make necessary or agreed repairs, decorations, alterations, or improvements, or to supply necessary or agreed services, or to show Premises to prospective or actual purchasers, tenants, mortgagees, lenders, appraisers, or contractors. Landlord and Tenant agree that twenty-four hours notice (oral or written) shall be reasonable and sufficient notice. In an emergency, Landlord or representative may enter Premises at any time without prior notice.

20. **SIGNS:** Tenant authorizes Landlord to place For Sale/Lease signs on the Premises.

21. **ASSIGNMENT/SUBLETTING:** Tenant shall not sublet all or any part of Premises, or assign or transfer this Agreement or any interest in it, without prior written consent of Landlord. Unless such consent is obtained, any assignment, transfer or subletting of Premises or this Agreement or tenancy, by voluntary act of Tenant, operation of law, or otherwise, shall be null and void, and, at the option of Landlord, terminate this Agreement. Any proposed assignee, transferee or sublessee shall submit to Landlord an application and credit information for Landlord's approval, and, if approved, sign a separate written agreement with Landlord and Tenant. Landlord's consent to any one assignment, transfer, or sublease, shall not be construed as consent to any subsequent assignment, transfer or sublease, and does not release Tenant of Tenant's obligation under this Agreement.

22. ☐ **LEAD PAINT (CHECK IF APPLICABLE):** Premises was constructed prior to 1978. In accordance with federal law, Landlord gives, and Tenant acknowledges receipt of, the disclosures on the attached form (such as C.A.R. Form FLD-14) and a federally approved lead pamphlet.

23. **POSSESSION:** If Landlord is unable to deliver possession of Premises on Commencement Date, such Date shall be extended to date on which possession is made available to Tenant. If Landlord is unable to deliver possession within 5 (or ☐ _____) calendar days after agreed Commencement Date, Tenant may terminate this Agreement by giving written notice to Landlord, and shall be refunded all rent and security deposit paid.

24. **TENANT'S OBLIGATIONS UPON VACATING PREMISES:** Upon termination of Agreement, Tenant shall: (a) give Landlord all copies of all keys or opening devices to Premises, including any common areas; (b) vacate Premises and surrender it to Landlord empty of all persons; (c) vacate any/all parking and/or storage space; (d) deliver Premises to Landlord in the same condition as referenced in paragraph 9; (e) clean Premises, including professional cleaning of carpet and drapes; (f) give written notice to Landlord of Tenant's forwarding address; and (h) _____

All improvements installed by Tenant, with or without Landlord's consent, become the property of Landlord upon termination.

25. **BREACH OF CONTRACT/EARLY TERMINATION:** In addition to any obligations established by paragraph 24, in event of termination by Tenant prior to completion of the original term of Agreement, Tenant shall also be responsible for lost rent, rental commissions, advertising expenses, and painting costs necessary to ready Premises for re-rental.

26. **TEMPORARY RELOCATION:** Tenant agrees, upon demand of Landlord, to temporarily vacate Premises for a reasonable period, to allow for fumigation, or other methods, to control wood destroying pests or organisms, or other repairs to Premises. Tenant agrees to comply with all instructions and requirements necessary to prepare Premises to accommodate pest control, fumigation or other work, including bagging or storage of food and medicine, and removal of perishables and valuables. Tenant shall only be entitled to a credit of rent equal to the per diem rent for the period of time Tenant is required to vacate Premises.

27. **DAMAGE TO PREMISES:** If, by no fault of Tenant, Premises are totally or partially damaged or destroyed by fire, earthquake, accident or other casualty, which render Premises uninhabitable, either Landlord or Tenant may terminate Agreement by giving the other written notice. Rent shall be abated as of date of damage. The abated amount shall be the current monthly rent prorated on a 30-day basis. If Agreement is not terminated, Landlord shall promptly repair the damage, and rent shall be reduced based on the extent to which the damage interferes with Tenant's reasonable use of Premises. If damage occurs as a result of an act of Tenant or Tenant's guests, only Landlord shall have the right of termination, and no reduction in rent shall be made.

Tenant and Landlord acknowledge receipt of copy of this page, which constitutes Page 2 of _____ Pages.
Tenant's Initials ( __ ) ( __ )   Landlord's Initials ( __ ) ( __ )

┌─ OFFICE USE ONLY ─┐
Reviewed by Broker
or Designee ____
Date ____
└────────────────┘



PRINT DATE
R OCT 97

Premises: _1614 E. SANTA CLARA ST. "A"_                                              Date _3/22/99_

**28. INSURANCE:** Tenant's personal property and vehicles are not insured by Landlord or, if applicable, owner's association, against loss or damage due to fire, theft, vandalism, rain, water, criminal or negligent acts of others, or any other cause. Tenant is to carry Tenant's own insurance (Renter's insurance) to protect Tenant from any such loss.

**29. WATERBEDS:** Tenant shall not use or have waterbeds on the Premises unless: (a) Tenant obtains a valid waterbed insurance policy; (b) Tenant increases the security deposit in an amount equal to one-half of one month's rent; and (c) the bed conforms to the floor load capacity of Premises.

**30. WAIVER:** The waiver of any breach shall not be construed as a continuing waiver of the same or any subsequent breach.

**31. NOTICE:** Notices may be served at the following address, or at any other location subsequently designated:
Landlord: _P.O. BOX 368_                                              _LAWRAH BRAY_
_P. O. BOX 368_                                              _1614 E. SANTA CLARA "A"_
_VENTURA, CA. 93002_                                              _VENTURA, CA. 93001_

**32. TENANCY STATEMENT (ESTOPPEL CERTIFICATE):** Tenant shall execute and return a tenancy statement (estoppel certificate) delivered to Tenant by Landlord or Landlord's agent within 3 days after its receipt. The tenancy statement acknowledges that this Agreement is unmodified and in full force, or in full force as modified, and states the modifications. Failure to comply with this requirement shall be deemed Tenant's acknowledgement that the tenancy statement is true and correct, and may be relied upon by a lender or purchaser.

**33. JOINT AND INDIVIDUAL OBLIGATIONS:** If there is more than one Tenant, each one shall be individually and completely responsible for the performance of all obligations of Tenant under this Agreement, jointly with every other Tenant, and individually, whether or not in possession.

**34. ☐ MILITARY ORDNANCE DISCLOSURE:** (If applicable and known to Landlord) Premises is located within one mile of an area once used for military training, and which may contain potentially explosive munitions.

**35. TENANT REPRESENTATIONS; CREDIT:** Tenant warrants that all statements in Tenant's rental application are accurate. Tenant authorizes Landlord and Broker(s) to obtain Tenant's credit report at time of application and periodically during tenancy in connection with approval, modification, or enforcement of this Agreement. Landlord may cancel this Agreement, (a) before occupancy begins, upon disapproval of the credit report(s), or (b) at any time, upon discovering that information in Tenant's application is false. A negative credit report reflecting on Tenant's record may be submitted to a credit reporting agency if Tenant fails to fulfill the terms of payment and other obligations under this Agreement.

**36. OTHER TERMS AND CONDITIONS; SUPPLEMENTS:** _PLEASE CONSULT MGMT._
_CO. BEFORE USING ANY SIGNNAGE_

The following ATTACHED supplements are incorporated in this Agreement: _____

**37. ATTORNEY'S FEES:** In any action or proceeding arising out of this Agreement, the prevailing party between Landlord and Tenant shall be entitled to reasonable attorney's fees and costs.

**38. ENTIRE CONTRACT:** Time is of the essence. All prior agreements between Landlord and Tenant are incorporated in this Agreement which constitutes the entire contract. It is intended as a final expression of the parties' agreement, and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. The parties further intend that this Agreement constitutes the complete and exclusive statement of its terms, and that no extrinsic evidence whatsoever may be introduced in any judicial or other proceeding, if any, involving this Agreement. Any provision of this Agreement which is held to be invalid shall not affect the validity or enforceability of any other provision in this Agreement.

**39. AGENCY:**

**A.** Confirmation: The following agency relationship(s) are hereby confirmed for this transaction:
Listing Agent: (Print firm name) _____ is the agent of
(check one): ☐ the Landlord exclusively; or ☐ both the Landlord and Tenant.
Leasing Agent: (Print firm name) _____ (if not same as Listing Agent) is the agent of
(check one): ☐ the Tenant exclusively; or ☐ the Landlord exclusively; or ☐ both the Tenant and Landlord.

**B.** Disclosure: ☐ (If checked): The term of this lease exceeds one year. An agency disclosure form has been provided to Landlord and Tenant, who each acknowledge its receipt.

**40. ☐ INTERPRETER/TRANSLATOR:** The terms of this Agreement have been interpreted/translated for Tenant into the following language: _____. Interpretation/translation service has been provided by (print name) _____, who has the following Driver's License or other identification number: _____. Tenant has been advised to rely on, and has in fact solely relied on the interpretation/translation services of the above-named individual, and not on the Landlord or other person involved in negotiating the Agreement. If the Agreement has been negotiated primarily in Spanish, Tenant has been provided a Spanish language translation of this Agreement pursuant to California Civil Code. (C.A.R. Form LR-14-S fulfills this requirement.)
Signature of interpreter/translator _____ Date _____

Landlord and Tenant acknowledge and agree that Brokers: (a) Do not guarantee the condition of the Premises; (b) Cannot verify representations made by others; (c) Cannot provide legal or tax advice; (d) Will not provide other advice or information that exceeds the knowledge, education or experience required to obtain a real estate license. Furthermore, if Brokers are not also acting as Landlord in this Agreement, Brokers (e) Do not decide what rental rate a Tenant should pay or Landlord should accept; and (f) Do not decide upon the length or other terms of tenancy. Landlord and Tenant agree that they will seek legal, tax, insurance, and other desired assistance from appropriate professionals.

Tenant _Lawrah D. Bray_                                              Date _3/23/99_

Tenant _____                       Date _____

Landlord _Elizabeth F. Berry_                                         Date _3/23/99_
(owner or agent with authority to enter into this lease)

Landlord _____                     Date _____
(owner or agent with authority to enter into this lease)

Agency relationships are confirmed as above. Real estate brokers who are not also Landlord in this Agreement are not a party to the Agreement between Landlord and Tenant.

Real Estate Broker _____
(Leasing Firm Name)                                By _____ Date _____
Address _____

Real Estate Broker _____ Telephone _____
(Listing Firm Name)                                By _____ Fax _____
Address _____

This form is _____ Telephone _____

VENTURA
SUPERIOR COURT

# FILED

MAR 2 7 2003

MICHAEL D. PLANET
Executive Officer and Clerk

BY: _____ , Deputy

## SUPERIOR COURT OF CALIFORNIA
## COUNTY OF VENTURA

LAURACK  D.  BRAY

**Plaintiff,**

v.

ANDREA  AIREY, MILT AIREY,
And/or  OWNER
Jointly and Severally

**Defendants.**

NO. CIV218468

Date: March 27, 2003
Time:  8:30 a.m.
Ct.Room: 34

---

## TEMPORARY RESTRAINING ORDER

On reading the verified Complaint of Plaintiff on file in the above-entitled

action, and the declarations, and the memorandum of points and authorities

submitted therewith, it appears to the satisfaction of the court that this is a proper

case for granting a temporary restraining order, and that unless the temporary

restraining order prayed for be granted,   Plaintiff stands to suffer irreparable harm

or the threat of irreparable harm before the matter can be heard on notice.

IT IS FURTHER ORDERED that the above-named Defendants, ~~and each~~ Andrea Airey

~~and Milt Airey~~

~~of them,~~ pending the hearing and determination of an order to show cause why a

preliminary injunction should not issue, the above-named  Defendants, and each of

1

EXHIBIT # 12

them ~~and their agents or representatives~~, and all persons acting in concert or

~~participating with them~~, are restrained and enjoined from collecting or otherwise

requesting or requiring rent money from Plaintiff on or about April 1, 2003 or

anytime thereafter until further notice from the court for the month of April, 2003

and any months thereafter until further notice by the court;

IT IS FURTHER ORDERED that the above-named Defendants and each of

them appear ___April 14, 2003 @ 9:30 am in Courtroom 34___

_____

then and there to show cause, if any they have why they ~~and their agents and all~~

~~persons acting in concert or participating with them~~, should not be mandatorily

enjoined or required during the pendency of this action to pay the current electric

bills due and owing to Southern California Edison (before repair was made), in an

amount of $488.57 (to make the amount owed current or up to date); and it is

FURTHER ORDERED that_____

_____

_____

Let the above Order issue.

Dated _March 27, 2003_

_____
Judge of the Superior Court

2

VENTURA
SUPERIOR COURT
FILED

APR 1 4 2003

MICHAEL D. PLANET
Executive Officer and Clerk
BY: _____ . Deputy

# SUPERIOR COURT OF CALIFORNIA
## COUNTY OF VENTURA

LAURACK D. BRAY

Plaintiff,

v.

ANDREA AIREY, MILT AIREY,
and/or HOI T. NGUYEN

Defendants.

NO. CIV218468

## PRELIMINARY INJUNCTION

The application of Plaintiff Laurack D. Bray for a preliminary injunction came

on regularly for hearing by the court this date in accordance with the order to show

cause issued by this court on  March 27, 2003.  Plaintiff appeared by counsel John

G. Hartnett; ~~Defendant appeared by counsel~~ did not appear _____

On proof made to the court's satisfaction , and good cause appearing:

IT IS ORDERED that during the pendency of this action the above-named

defendants, and each of them, and their officers, agents, employees, representatives,

and all persons acting in concert or participating with them, are enjoined and

restrained from engaging in, committing, or performing, directly or indirectly, by

EXHIBIT #13

any means whatsoever, any of the following acts:

A. Requesting, requiring, or collecting payment of rent money from Plaintiff, and Plaintiff is not required to pay rent, on the property located at 1019 E. Santa Clara Street, Apartment #A , Ventura, CA, 93001 or said property of the herein dispute involving the herein parties, for the month of April, 2003 and thereafter or until further notice by the court;

B. Changing management agents (from Defendants Andrea and Milt Airey to another) for Plaintiff until a new rental agreement is presented and entered into, between the parties, identifying and designating the new manager or agent ; and

IT IS FURTHER ORDERED that the above-named Defendants are required and ordered to pay the electric bill accrued after January 31, 2003 or $360.92; and it is

FURTHER ORDERED that Defendants are required to pay Plaintiff's electric bill from the date of this order until such time that they can assure the court that proper repairs have been made so that Plaintiff is only paying for electric use for his apartment (#A) or that they volunteer to assume payment of the bill because they are unable to assure the court that Plaintiff is only paying the electric bill for his apartment; and it is

FURTHER ORDERED that   _no bond or under taking_

_is required._

Let the above Order issue.

Dated _April 14, 2003_

_____
Judge of the Superior Court

3